## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ALAN DWORMAN,

      *Plaintiff*,

      v.

PHH MORTGAGE SERVICES,
OCWEN LOAN SERVICING, LLC, and FIRST
OHIO BANC & LENDING, INC.,

      *Defendants*.

Case No.:  4:23-cv-40017-MRG

## MEMORANDUM & ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 33]

**GUZMAN, D.J.**

## I.  INTRODUCTION

This is a mortgage loan modification dispute.  Plaintiff-mortgagor Alan Dworman alleges that Defendant-mortgage servicers Ocwen Loan Servicing, LLC and PHH Mortgage Services (the "Defendants")[1] breached a contractual obligation to forgive $406,714.94 worth of mortgage debt. Plaintiff further contends that the alleged failure to honor this promise was an unfair or deceptive practice in violation of Mass. Gen. Laws ch. 93A ("Chapter 93A") and a breach of the implied covenant of good faith and fair dealing.  Plaintiff also seeks declaratory relief.  For their part, Defendants contend that if anyone breached the modification agreement, it was Plaintiff such that they are entitled to summary judgment on all claims.  This Court need not decide whether Plaintiff breached the modification agreement, but it has determined that Defendants did not.  Further, as

---

[1] Defendant First Ohio Banc & Lending, Inc. is not a party to this summary judgment motion.

discussed below, Plaintiff's other claims fail, too.  Accordingly, and for the following reasons, Defendants' summary judgment motion [ECF No. 33] is **GRANTED**.

II.    **BACKGROUND**

   a.  **The Facts[2]**

      i.  **The Loan**

On April 27, 2007, Plaintiff borrowed $549,600.00 from Defendant First Ohio Banc & Lending, Inc. [ECF No. 45 at 1].  This transaction was evidenced by a note (the "Note"), secured by a mortgage, [ECF No. 35-2], dated that same day, granted in favor of Defendant First Ohio Banc & Lending, Inc. as mortgagee (the "Mortgage," together with the Note, the "Loan").  [Id.] The Mortgage encumbered the real property known as 1 Wildewood Drive, Paxton, Massachusetts 01612 (the "Property"), [id.], and was recorded with the Worcester County Registry of Deeds on June 6, 2007, in Book 41273, Page 124.  [ECF No. 39 at 1–2].  The original Loan servicer was Defendant PHH.  [ECF No. 1-1 at 3].

      ii.  **Plaintiff Loses His Job During the 2008 Financial Crisis**

At least during the life of the Mortgage, Plaintiff worked in the construction materials field. [ECF No. 45 at 12].  Plaintiff allegedly lost his job in the aftermath of the 2008 financial crisis, which had severe effects on the construction market.  [Id.]  Plaintiff's unemployment status, coupled with his high monthly mortgage payment at the time (about $6,000) led him to seek mortgage assistance.  [Id. at 12–13].

      iii.  **The Trial Period Plan**

In response to Plaintiff's request for mortgage assistance, Defendants offered Plaintiff a

---

[2] The facts recited here are undisputed unless otherwise noted.

"Home Affordable Modification Program *Trial* Period Plan" [3] on July 18, 2016.  [ECF No. 39-2

(emphasis added)].  Plaintiff accepted this trial period offer[4] on July 22, 2016.  [ECF No. 35-1 at

10].  Notably, the July 18, 2016, offer document stated in the "Frequently Asked Questions"

section that if a borrower's loan was permanently modified, their "interest rate and [their] monthly

principal and interest payments will be fixed for the remaining life of [their] loan, unless [their]

initial modified interest rate is below current market interest rates."  [ECF No. 39-2 at 22].  In other

---

[3] Notably, Defendants were then participating in the U.S. Treasury Department's "Home
Affordable Modification Program" ("HAMP").  As another federal district court has explained,

> [HAMP] . . . was a voluntary program under [the Emergency Economic Stabilization Act
> of 2008] designed to prevent avoidable foreclosures by providing homeowners with
> affordable mortgage-loan modifications and other alternatives to eligible buyers.  HAMP's
> primary goal was to relieve the burden on homeowners by lowering their mortgage
> payments to 31% or less of their gross monthly income.  Investors would receive payments
> and a guarantee that no modification would result in a mortgage worth less than the net-
> present value of the property.  In return, mortgage servicers, in addition to their annual
> servicing fees, received HAMP incentive payments to complete the modifications.  Each
> successful modification entitled the servicer from $1,200-2,000 depending on how long the
> mortgage was delinquent.

United States ex rel. Fisher v. JPMorgan Chase Bank N.A., No. 4:16-CV-00395, 2020 U.S. Dist.
LEXIS 9400, at *2–3 (E.D. Tex. Jan. 21, 2020).

[4] As here, the standard HAMP loan modification process occurred in two steps:

> First, the lender or mortgage servicer determined whether the borrower was
> qualified to participate in HAMP under its eligibility criteria, and if so, the servicer
> offered and implemented a Trial Period Plan (TPP) in which the borrower made
> modified mortgage payments, submitted additional financial information and, if
> requested, underwent credit counseling for a period of three months.  Second,
> [a]fter the trial period, if the borrowers complied with all terms of the TPP
> Agreement -- including making all required payments and providing all required
> documentation -- and if the borrower's representations remained true and correct,
> the servicer had to offer a permanent modification.

Healey v. Wells Fargo, N.A., No. 11-CV-3340, 2012 Pa. Dist. & Cnty. Dec. LEXIS 165, at *23–
24 (C.P. Mar. 20, 2012) (internal quotation marks and citations omitted).

words, the offer indicated that although the *terms* of a modified loan might change, permanent modification did not somehow equal cancellation of the underlying loan.  [See id.]

Under the terms of the trial period plan, Plaintiff was required to make three monthly payments of $2,105.33 on September 1, 2016, October 1, 2016, and November 1, 2016, respectively -- all of which he timely made. [ECF No. 39 at 2].  Plaintiff's successful completion of the trial period plan rendered him eligible for consideration of a permanent modification plan. [Id.]; [ECF No. 39-2 at 3 (July 18, 2016, trial plan offer explaining, "[i]f you successfully complete your HAMP Trial Period Plan, you will be eligible for review for a permanent modification")].

### iv.  **The Permanent Loan Modification Agreement (the "Contract")**

After the successful completion of the trial period plan, the parties entered into a permanent modification agreement, which Plaintiff signed on or about November 14, 2016.[5]  [ECF No. 35-4 at 1–9].[6]

The Contract contained the following relevant provisions:

- **Section 3**: the borrower providing in part that, "[i]f my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 12/01/2016 . . . and all unpaid late charges will be waived.  The Loan Documents will be modified and ***the first modified payment will be due on 12/01/2016.***

[Id. at 3–4 (emphasis added)].

- **Section 3(C)**: stating that:

  o "$465,114.94 of the New Principal Balance shall be deferred ("Deferred Principal Balance") and I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, $406,714.94 of the Deferred Principal Balance is

---

[5] The Court was not able to discern on what day this agreement was executed, but the parties agree that a copy of the executed version was sent to Plaintiff on December 12, 2016.  [ECF No. 39 at 2].

[6] From this point forward, and in the interest of avoiding confusion, the Court will refer to the permanent modification agreement as "the Contract" unless quoting any documents from the record or citing the parties' briefs.

eligible for forgiveness ("Deferred Principal Reduction Amount"). ***Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of 09/01/2016***, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $356,750.00."[7]

[Id. at 4 (emphasis added)].

- **Section D**: the borrower providing that, "I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement."

  [Id. at 5].

- **Section F**: the borrower stating that,

  o "I Agree to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which I am entitled, if applicable and any other amounts still owed under the Loan Documents by the earliest of: (i) The date I sell or transfer an interest in the Property, (ii) The Date I pay the entire interest Bearing Principal Balance, or (iii) The Maturity Date."

  [Id. at 5].

At the time of the Contract, the delinquent taxes, insurance and interest were capitalized into a new principal balance of $821,846.94. [ECF No. 45 at 14]. Moreover, the interest rate was lowered under the Contract to 2.0% and Plaintiff's monthly payment became $2,106.24, in addition to a "balloon" payment due at the end of the Contract's term. [ECF No. 42 at 14].

### v. The IRS Documentation & Defendant Ocwen's U.S. Treasury Department Incentive Payment

The Internal Revenue Code required Defendant Ocwen to issue Plaintiff a Form 1099-C

---

[7] As Defendants have explained, this provision created a repayment regime whereby "***if Plaintiff did not fall more than three months behind*** on his payments under the [Contract] ***on each of the next three*** anniversaries of his 9/1/2016 Modification, one third of the $406,714.94 in Deferred Principal Balance would be forgiven following each anniversary." [ECF No. 34 at 3 (emphasis added)].

because the Contract included a Deferred Principal Reduction Amount, [ECF No. 35-7 at 5], and Defendants timely did so. [ECF No. 35-5].[8] Since the Contract was made accordance with HAMP, see *supra*, Defendant Ocwen received a $1,200 incentive payment from the U.S. Treasury Department since it had entered into the Contract with Plaintiff. [ECF No. 39 at 3].

### vi. **Plaintiff's Alleged Default under the Contract & the Initiation of Foreclosure Proceedings**

In January 2017, Defendants considered Plaintiff to be in default of his obligations under the Contract and began sending him letters to his effect. [See, e.g., ECF No. 34 at 3–5 (Defendants detailing the multiple letters sent to Plaintiff stating they considered him to be in default)]. Plaintiff has explained that this delinquency was driven by his "not being paid commissions after starting a new role in Summer 2016." [ECF No. 45 at 15].

Defendants regularly notified Plaintiff of his delinquent status under the Contract. Just by way of example, Defendant Ocwen sent Plaintiff a monthly Mortgage statement on July 17, 2017, indicating that the reinstatement amount due was $12,766.78 -- *about six months'* worth of payments due under the Contract. [ECF No. 35-14]. That Plaintiff was not making timely payments under the Contract, at least during certain periods of the Contract's lifetime, is

---

[8] The parties dispute whether Plaintiff paid any taxes in 2016 on the Deferred Principal Balance listed on the 1099-C. [ECF No. 39 at 3–4]. Similarly, the parties also dispute whether Defendant Ocwen received a "tax write-off" due to their having issued the Form 1099-C to Plaintiff. [Id.]

The Court finds that *neither* of these twin disputes are "material" for purposes of summary judgment since their resolution would not affect the outcome of the suit under the governing law. See Morris v. Gov't Dev. Bank, 27 F.3d 746, 748 (1st Cir. 1994) (explaining that a fact is "material" for purposes of summary judgment if it "is one that might affect the outcome of the suit under the governing law").

Plaintiff fails to explain how Defendant Ocwen's corporate tax filings have anything *materially* to do with his claims against it in this case.

undisputed.  For example, at deposition, Plaintiff admitted that he did not make all his payments on time in 2017 or 2018.  [ECF No. 35-1 at 34].   On March 12, 2018, Defendant Ocwen referred the Mortgage to foreclosure counsel and the Mortgage was accelerated.  [ECF No. 35-17].

### vii.   The Parties Enter into a Repayment Plan; Plaintiff Remains in Default

Also in March 2018, Plaintiff entered a repayment plan with Defendants. [ECF 45 at 7]; [ECF No. 35-18].  Despite the institution of this plan, Plaintiff's account remained delinquent for significant stretches of 2018 and 2019.  For example, Defendants produced copies of monthly "mortgage statements" of his account from September 2018 [ECF No. 35-20], February 2019 [ECF No. 35-21], and April 2019 [ECF No. 35-22], all of which showed that Plaintiff was in a default status under the Contract.[9]

### viii.   Defendant Ocwen Merges with Defendant PHH, and Plaintiff's Account Remains in Default

On June 4, 2019, Defendants notified Plaintiff that Defendant Ocwen and Defendant PHH had merged and that, going forward, Defendant PHH would serve as Plaintiff's mortgage servicer. [ECF No. 35-23].  This letter, *which Plaintiff admits to receiving*, stated that Plaintiff's principal account balance was $342,838.62 and that the total unpaid debt as of that date was $8,228.24. [ECF No. 45 at 8–9].  However, on August 13, 2019, Defendants sent a follow-up letter notifying Plaintiff that the June 4, 2019, letter contained only the amortizing portion of the principal balance, and that the non-amortizing Deferred Principal Balance due upon the loan payoff was inadvertently omitted.  [Id.]  Therefore, the letter concluded, the principal balance of the loan as of June 1, 2019, was $807,953.56.  [Id. at 5].  Plaintiff *denies receiving* this letter.  [Id.]

In both August and September of 2019, Defendants claim to have sent Plaintiff "notice[s] of intention to foreclose."  [Id. at 9–10].  Plaintiff denies knowledge of either of these letters.  [Id.].

[9] Plaintiff neither admits nor denies receiving these particular mortgage statements.

7

### ix.  **Plaintiff Starts Making More Regular Payments in 2019; Requests that Defendants Send a "Payoff Letter"**

At some point in 2019, Plaintiff began to make more regular payments under the Contract. [Id at 16].  Plaintiff began to request a "payoff letter" from Defendants.[10]  Defendants responded with a letter dated April 6, 2020, informing Plaintiff that the Deferred Principal Balance of approximately $406,714.94 was *not* forgiven because Plaintiff's loan was in delinquent status during the first anniversary of the Contract (i.e., on or about September 1, 2017).  [ECF No. 45 at 17].  Plaintiff admits to receiving this letter, although he objects to its conclusions.  [Id.]

### b.  **Procedural History**

Plaintiff's Complaint [ECF No. 1-1], which Defendants removed to this Court from the Massachusetts Superior Court on diversity grounds, asserts four causes of action:

| Count # | Cause of Action |
|---|---|
| I | Breach of Contract |
| II[11] | Breach of the Covenant of Good Faith and Fair Dealing |
| III | Violation of Chapter 93A |
| IV | Declaratory Relief (under Mass. G.L. c. 231A, *et seq*.) |

Defendants filed their Answer [ECF No. 4] and the undersigned referred the case to U.S. Magistrate Judge Hennessy for full pretrial management (except for the resolution of any dispositive motions).  [ECF No. 15].  Judge Hennessy later imposed a summary judgment briefing schedule.  [ECF No. 22].  After all briefing was complete, the undersigned held an in-person summary judgment hearing.  [ECF No. 52].

---

[10] As an aside, the Court notes that if Plaintiff believed the June 2019 transfer letter to be proof positive that the debt was in fact relieved, he might not have needed a payoff letter.

[11] Due to an apparent typographical error, the Complaint contains two causes of action labeled "Count III."  The Court therefore construes the first of these two causes of action as Count II and the second as Count III.

III.    **THIS COURT'S JURISDICTION AND THE APPLICABLE SUBSTANTIVE LAW**

The Court has determined[12] that it has subject matter jurisdiction under 28 U.S.C. § 1332 (i.e., diversity jurisdiction) over each of Plaintiff's claims because (1) there is complete diversity of citizenship between Plaintiff and each of the Defendants, [see ECF No. 1 at 2–3], and because (2) the amount in controversy (i.e., at least $406,714.94)[13] exceeds the sum of $75,000, exclusive of interests and costs. 28 U.S.C.S. § 1332(a). Defendants have not challenged this Court's personal jurisdiction over them. Venue is proper in this judicial district.

It is undisputed that Massachusetts law supplies the substantive rules of decision for each of Plaintiffs' four causes of action. See Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32 (1st Cir. 2004) ("A federal court sitting in diversity jurisdiction is obliged to apply federal procedural law and state substantive law.").

IV.    **THE SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if the moving party shows that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. Morris, 27 F.3d at 748. A fact is "material" when it may affect the outcome of the suit. Id.

At the summary judgment stage, the Court must view the record in the light most favorable to the non-moving party and must "indulge all reasonable inferences" in their favor. Martins v.

---

[12] McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire *sua sponte* into its own subject matter jurisdiction.") (citations omitted).

[13] [ECF No. 1-1 at 7]; Hill v. Defendants Int'l Mach. Corp., 386 F. Supp. 2d 427, 429 (S.D.N.Y. 2005) ("It is a fundamental principal of law that whether subject matter jurisdiction exists is a question answered by looking to the complaint as it existed at the time the petition for removal was filed." (footnote omitted)).

<u>Vt. Mut. Ins. Co.</u>, 662 F. Supp. 3d 55, 64 (D. Mass. 2023) (citing <u>O'Connor v. Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993)). In the first instance, the moving party "bears the burden of demonstrating the absence of a genuine issue of material fact." <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted). If a properly supported summary judgment motion is presented, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial," and may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250, 256–57 (1986). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." <u>Walsh v. Town of Lakeville</u>, 431 F. Supp. 2d 134, 143 (D. Mass. 2006). "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." <u>Magee v. United States</u>, 121 F.3d 1, 3 (1st Cir. 1997).

## V.   <u>ANALYSIS</u>

### a.   <u>Count I (Breach of Contract)</u>

The gravamen of Plaintiff's Count I claim is that Defendants breached the Contract by failing to forgive $406,714.94 on the Mortgage (i.e., the Deferred Principal Reduction Amount) such that Plaintiff is owed money damages in that amount. [ECF No. 1-1 at 4–5].[14] Defendants'

---

[14] The Court observes that Plaintiff *did not* exactly specify which term(s) and/or provision(s) of the Contract Defendants allegedly breached -- a general requirement for breach of contract claims under Massachusetts law. <u>See, e.g.</u>, <u>Brooks v. JPMorgan Chase Bank, N.A.</u>, No. 12-11634-FDS, 2013 U.S. Dist. LEXIS 99743, at *7 (D. Mass. July 17, 2013) ("To assert a breach of contract claim, a *pro se* plaintiff must, at minimum, point to the specific terms of a contract between herself and defendant that she alleges defendant has breached.").

However, this failure was not procedurally fatal to Plaintiff's Count I case because the Contract is part of the summary judgment record and because its provisions speak for themselves, which the

central argument in response is that whereas they never breached the Contract, the summary judgment record reveals that Plaintiff allegedly breached the Contract by repeatedly falling into default. [ECF No. 34 at 10].[15] Here, Defendants do not dispute that the Contract was valid and binding. However, they do contend that there is no genuine issue of material facts as to the *breach*.[16]

### i. <u>Legal Landscape</u>

To prevail on a breach of contract claim under Massachusetts law, a plaintiff must demonstrate that "[1] there was an agreement between the parties; [2] the agreement was supported by consideration; [3] the plaintiff was ready, willing, and able to perform his or her part of the contract; [4] the defendant committed a breach of the contract; [5] and the plaintiff suffered harm as a result." <u>Bulwer v. Mount Auburn Hosp.</u>, 46 N.E.3d 24, 39 (Mass. 2016).

### ii. <u>Application</u>

Since it is undisputed that the Contract was valid, the Court begins by focusing on which

---

Court interprets according to their plain and ordinary meaning. <u>See, e.g.</u>, <u>Hull Permanent Sewer Comm'n v. United Water Envtl. Servs.</u>, No. 1883-CV-01056, 2020 Mass. Super. LEXIS 769, at *7 n.3 (Mass. Super. Ct. Aug. 28, 2020) ("The Court notes that Hull does not cite to specific contract provisions in asserting its allegations for breach of contract. However, such absence is not fatal to its claims because the Operating Agreement is part of the summary judgment record and its provisions speak for themselves, which this Court interprets by their plain and ordinary meaning." (citation omitted)).

[15] Although Defendants did not use the term "unclean hands" in their briefing, the Court will briefly address any potential confusion stemming from their argument that liability for breach of contract should not lie against them because Plaintiff allegedly breached the Contract. To be clear, *even if* Plaintiff did breach the Contract -- a legal question that this Court need not and will not address (since Defendants have not brought a breach of contract counterclaim) -- that fact alone would not have necessarily prevented Plaintiff from prevailing in his breach of contract action *for money damages* against Defendants *as long as* Plaintiff could prove, among other things, that Defendants breached the Contract. <u>See, e.g.</u>, <u>Saggese v. Kelley</u>, 837 N.E.2d 699, 706 (2005) (explaining that the doctrine of unclean hands "is an equitable principle, and generally has no application to an action at law for breach of contract"). In other words, the only question presently before Court is whether Defendants breached the Contract.

[16] Hanging their hat on the breach argument, Defendants did not brief the issue of damages. [<u>See</u> ECF No. 34].

provision(s) Plaintiff alleges Defendants breached.  Plaintiff contends that Defendants breached "by failing to forgive $406,714.94 on the Mortgage, and refusing to issue a payoff statement with the reduced amount."  [ECF No. 1-1 at 4].  Since this sum is a reference to the Deferred Principal Reduction Amount, Plaintiff's claim most directly implicates Section 3(C) of the Contract.  This provision, which is also cited *supra*, provides that:

> $465,114.94 of the New Principal Balance shall be deferred ("Deferred Principal Balance") and I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, $406,714.94 of the Deferred Principal Balance is eligible for forgiveness ("Deferred Principal Reduction Amount"). ***Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of 09/01/2016***, the Lender ***shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal reduction Amount***. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $356,750.00.

[ECF No. 35-4 at 4 (emphasis added)].

Thus, Plaintiff's breach claim alleges, in the words of the Contract, that Defendants wrongfully failed to ". . . reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal reduction Amount."  [Id.]  To determine whether that claim has merit, the Court naturally must next determine whether there were any contractual obligations incumbent upon Plaintiff that served to trigger Defendants' reduction obligations.

A plain reading of the preceding contractual language in the same sentence cited *supra* reveals that Plaintiff carried a contractual obligation not to be more than three months delinquent on his payments under the Contract.  Specifically, the Contract provided the following condition that would serve to trigger Defendants' tripartite, annual reduction obligations: "Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of

09/01/2016 . . . ." [ECF No. 35-4 at 4]. The Contract also defined what it meant for Plaintiff to be in a state of "default." Specifically, Section D contains Plaintiff's representation that, "I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement." [Id. at 5]. Given all of this, the precise question is whether there is a *genuine* dispute of fact that Defendants breached their contractual obligations to Plaintiff.

A close review of the undisputed factual record reveals that Defendants did not breach the Contract. Plaintiff fell more than three months' behind on his payments soon after the December 2016 execution date. For example, it is undisputed that on June 17, 2017, Defendant Ocwen sent Plaintiff a delinquency notice indicating that he was one hundred and thirty-days delinquent on his payments. [ECF No. 45 at 6]. Plaintiff's default status continued in 2018. At deposition, for example, Plaintiff admitted that he did not make all his payments on time that year. Defendants sent a September 17, 2018, mortgage statement detailing that the loan was past due for one-hundred and sixty-nine days and that $6,451.62 was due. [Id. at 7].[17] Plaintiff's default status continued into the third year of the Contract (i.e., 2019), as well. For example, Defendants sent Plaintiff[18] a February 18, 2019, mortgage account statement showing that the account was due for $6,451.62. [ECF No. 35-21]. Notably, the first page of this statement lists the "Deferred Principal Balance" as $465,114.94. [Id.] In the face of the undisputed evidence that Plaintiff routinely did not meet his payment obligations under the Contract -- which would have triggered Defendants' reduction requirement -- Plaintiff advances several arguments, each of which the Court will take

---

[17] Plaintiff neither admitted nor denied receiving this notice [ECF No. 45 at 7], but the Court has reviewed the copy of the document [ECF No. 35-20] and has no reason to doubt that Defendants sent it to Plaintiff at his home address on or about September 17, 2018.

[18] Again, the Court has no reason to doubt that Defendants sent this letter to Plaintiff, despite Plaintiff's inability to verify receipt. [ECF No. 45 at 8].

in turn.

First, Plaintiff argues that his alleged breach was not a "material" breach under Massachusetts law such that Defendants were the first to breach the Contract by not forgiving the Deferred Principal Reduction Amount. [ECF No. 38 at 10–12]. This argument is circular, and the Court rejects it. The purpose and the plain language of the Contract are simple: to receive tripartite reductions of the Deferred Principal Reduction Amount *from Defendants*, *Plaintiff* needed to fulfill his obligation of timely payments according to the clearly agreed upon terms. In fact, the Contract even provided him with a meaningful layer of forgiveness, since he needed to not fall *more than three months'* behind to maintain eligibility for forgiveness. In the context of a contract that calls for timely payments in exchange for significant loan forgiveness, suggesting that the requirement to pay on time is somehow not material is not a valid legal argument. It fails.

Plaintiff next argues that *even if* his breach was material, Defendants waived their right to claim a breach. [ECF No. 38 at 12–13]. Specifically, Plaintiff argues that "a reasonable juror could find that the Defendants did not consider [Plaintiff's] timely payment of his [M]ortgage a material breach of the contract that the Defendants ultimately waived in their failure to timely assert strict adherence to the [Contract]." [Id. at 13]. Central to this argument is that by continuing to accept Plaintiff's payments, Defendants waived their right to now assert that he was, at relevant times, in breach of his obligations. This line of argument fails for several reasons. First, Defendants have not brought a counterclaim for a breach of contract, so the argument that they have somehow waived their right to do so misses the mark and is not before the Court. Secondly, the Mortgage -- the terms of which the Contract incorporated by reference to the extent they were not modified -- contains a directly on-point provision, namely Paragraph 12, which provides that:

**12. Borrower Not Released; Forbearance By Lender Not a Waiver**. Extension of the time for payment or modification of amortization of the sums secured by this Security

Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by the Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

[ECF No. 35-2 at 10].

Thus, by its own terms, the Mortgage, and by extension, the Contract, provided that any acceptance of late payments by Defendants did not constitute waiver of any right or remedy. Accordingly, Plaintiff's waiver argument is rejected.

Plaintiff's third and final breach of contract-related argument is that Defendant Ocwen's issuance of the Form 1099-C, coupled with Defendant PHH June 2019 transfer letter and Defendants' other actions operated to discharge Plaintiff's debt. The Court rejects this argument. As another Session of this Court has explained, the "majority view" is that "the Form 1099-C itself *does not operate* to legally discharge or otherwise cancel the underlying debt, but rather is simply the fulfillment of a reporting requirement to the IRS."  Wells Fargo Bank, N.A. v. Fraze, No. 19-10499-GAO, 2020 U.S. Dist. LEXIS 58057, at *5 (D. Mass. Apr. 2, 2020) (collecting cases) (emphasis added).  Even though some courts have observed that a Form 1099-C can seem confusing[19] to some consumers, this Court will not hold any potential confusion stemming from an IRS form against the Defendants, who were under a legal obligation to provide it.  Moreover,

---

[19] See, e.g., Gugger v. USAA Fed. Sav. Bank, No. 17-CV-1518-AJB-AGS, 2018 U.S. Dist. LEXIS 57040, at *7–8 (S.D. Cal. Apr. 3, 2018) ("There is no doubt that Form 1099-C is riddled with confusion to any average consumer.  From the notice's bold faced 'Cancellation of Debt,' to Code G's '[d]ecision or policy to discontinue collection,' it is feasible a consumer would celebrate upon receipt of this Form, thinking their debt was discharged, and along with it, the obligation to pay. However, how a consumer would interpret Form 1099-C is not an issue before this Court. Rather, whether or not the debt was ***actually*** discharged is.") (emphasis in original).

the record reveals that Defendants were, overall, quite responsive to Plaintiff and willing to work with him.  If Plaintiff had questions about the implications of the Form 1099-C, he could have called the Defendants and inquired.  The Court notes that the first page of apparently every mortgage statement sent to Plaintiff listed a "Customer Care" phone number.  [See, e.g., ECF No. 35-9 at 2].  For all of these reasons, the Court rejects the argument that the Form 1099-C operated to discharge Plaintiff's debt.

Attempting to distinguish the fact pattern in this case from others in which plaintiffs solely sought to rely on the issuance of a Form 1099-C, Plaintiff also raises the issue of the June 4, 2019, letter from Defendant PHH notifying him that it would be his new Mortgage servicer.  [ECF No. 32-23].  Plaintiff makes much of the fact that, on page 4 of this document, the "principal balance" is listed as $342,838.62.  [Id. at 5].  In his words, this letter is evidence that Defendant PHH "treated the Deferred Principal Reduction Amount as forgiven."  [ECF No. 38 at 16].  Not so fast.

First, Defendants timely sent a follow-up letter, dated August 13, 2019, in which they explained that the June 4, 2019, letter did not "include the non-amortizing deferred principal balance which is due upon loan payoff.  The correct principal balance as of 6/1/2019 which includes the deferred principal balance was: $807,935.56."  [ECF No. 35-24 at 2].  The letter then went on to invite Plaintiff to call its customer care center with "any questions."  [Id.]  Despite Plaintiff's assertion that he somehow did not receive this letter (which was sent to the same address as the June 4, 2019, letter), this Court finds that to the extent the June 4, 2019, letter contained an error, Defendants timely corrected it.  More fundamentally, nothing in the June 4, 2019 letter, expressly said that the $406,417.94 had been forgiven, *the letter just did not mention it*. Accordingly, Plaintiff's attempted reliance on the June 4, 2019 letter as evidence that Defendants had forgiven his debt is rejected.

Accordingly, no reasonable juror could conclude that Defendants breached the Contract. Therefore, summary judgment is hereby **ENTERED** in favor Defendants as to Count I.

### b.  Count II (Breach of the Covenant of Good Faith and Fair Dealing)

The essence of Plaintiff's Count II claim is that Defendants violated the implied covenant of good faith and fair dealing by (a) repeatedly and intentionally breaching the Contract to achieve "avoidance of a reduction of $406,714.94," and, relatedly by (b) refus[ing] to honor the 2016 debt cancellation."[20]  [ECF No. 1-1 at 5].  For their part, Defendants argue that nothing in the summary judgment record indicates that they ever interfered with Plaintiff's enjoyment of the benefits of the Contract.

### i.  Legal Landscape

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every valid contract.  Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004). Specifically, this implied covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."  Anthony's Pier Four, Inc. v. HBC Associates, 583 N.E.2d 806, 820 (Mass. 1991).  However, the implied covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship.  Uno Rests., 805 N.E.2d at 964.

As another Session of this Court has explained in the mortgage loan modification context, to prevail on such a claim, a plaintiff "must show that defendant 'acted with . . . dishonest purpose

---

[20] It is undisputed that Plaintiff's use of the term "2016 debt cancellation" refers to Plaintiff's interpretation of the Form 1099-C that Defendants were legally obligated to send him, discussed *supra*.  See, e.g., 26 CFR 1.6050P-1 (explaining that a Form 1099-C form must issue "[s]olely for purposes of the reporting requirements…***whether or not an actual discharge of indebtedness has occurred on*** or before the date on which the identifiable event has occurred…) (emphasis added).

or conscious wrongdoing necessary for a finding of bad faith or unfair dealing.'" Conte v. Bank of Am., N.A., 52 F. Supp. 3d 265, 269 (D. Mass. 2014) (citation omitted).  When reviewing such a claim, the "essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." Speakman v. Allmerica Fin. Life Ins. & Annuity Co., 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (citations omitted).

    **ii.  <u>Application</u>**

Plaintiff's brief discussion of Count II in his summary judgment briefing reveals his contention that Defendants' alleged breach of the covenant of good faith and fair dealing was materially related to their alleged breach of contract.  [See ECF No. 38 at 16–17 (Plaintiff arguing, "[a]pplying the facts to the present case, Defendants' failure to forgive the Deferred Principal Reduction Amount of [Plaintiff's] mortgage loan, constitute[d] an action that was intended to and actually injured [Plaintiff's] rights under the [Contract]")].

Under the legal standard as set forth in <u>Conte</u>, Plaintiff must show that Defendants acted with "dishonest purpose or conscious wrongdoing" to prevail on Count II.  See 52 F. Supp. 3d at 269.  No reasonable juror could find that Defendants acted in this way.  To the contrary, the record reveals that Defendants attempted on multiple occasions to provide Plaintiff with debt relief options, most especially the HAMP modification.  This Court finds that the parties acted in good faith in forming the Contract and that no reasonable jury could find that the Defendants acted with a dishonest purpose or committed any conscious wrongdoing.  Simply stated, Defendants applied the Contract's terms as written.  Whereas Plaintiff was more than three months' delinquent prior to the anniversary of the Contract.  Plaintiff was not eligible for forgiveness.  Accordingly, no

reasonable juror could conclude that Defendants breached the covenant of good faith and fair dealing.  Therefore, summary judgment is hereby **ENTERED** in favor Defendants as to Count II.

### c.  Count III (Violation of Chapter 93A)

Plaintiff's central Chapter 93A claim is that Defendants' various "acts and practices" committed in service of their alleged decision to "reneg[e]" on an agreement to forgive the Deferred Principal Reduction Amount constituted "willful and knowing" violations of the consumer protection statute.  [ECF No. 1-1 at 6].  Defendants counter that Plaintiff's claim is procedurally defective because Plaintiff did not allege sending a required, pre-suit Chapter 93A demand letter.  [ECF No. 34 at 14–15].  Defendants further argue that Plaintiff's claim is substantively flawed because there was nothing "unfair or deceptive" about Defendants' compliance with the terms of the Contract such that there were no "willful and knowing" violations of Chapter 93A.

### i.  Legal Landscape

Chapter 93A prohibits those that are engaged in trade or commerce from employing "unfair or deceptive acts or practices" and individuals have a private right of action under the statute.  Mass. Gen. Laws ch. 93A, §§ 2(a), 9.  Before such a claim can be brought in court, "a claimant seeking relief must send a written demand 'reasonably describing the unfair or deceptive act or practice relied upon' by the claimant."  Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 205 (1st Cir. 2004) (citing Mass. Gen. Laws ch. 93A, § 9(3)).  Although sending a demand letter is prerequisite to suit, the "failure to respond or an inadequate response to a demand letter ***is not itself*** a violation of Chapter 93A."  Dawe v. Capital One Bank, No. 04-40192-FDS, 2007 U.S. Dist. LEXIS 82870, at *4 n.2 (D. Mass. Oct. 24, 2007) (citations omitted and emphasis added).

19

To prevail on a Chapter 93A claim in court, a plaintiff must demonstrate: "[1] a deceptive act or practice on the part of the defendant, [2] an injury or loss suffered by the plaintiff and [3] a causal connection between the defendant's deceptive act or practice and the plaintiff's injury." See, e.g., Jones v. Experian Info. Sols., Inc., 141 F. Supp. 3d 159, 163 (D. Mass. 2015) (citations omitted). As the First Circuit has explained, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 54 (1st Cir. 1998).

A few additional elements of the Chapter 93A legal landscape are particularly relevant in this case. First, it is well-settled that merely breaching a contract does not trigger Chapter 93A liability. Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985) ("[M]ere breaches of contract, without more, do not violate chapter 93A." (citing Whitinsville Plaza, Inc. v. Kotseas, 390 N.E.2d 243, 251 (Mass. 1979)). Instead, for a claim to be viable, a Chapter 93A defendant's actions "must be egregiously wrong, and 'the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'" Hickman v. Pruco Life Ins. Co., No. 23-CV-11676-AK, 2024 U.S. Dist. LEXIS 89216, at *10 (D. Mass. May 17, 2024) (citations omitted). Indeed, as another Session of this Court has explained, "to transform a breach of contract into a Chapter 93A claim, 'the breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party.'" Wagner v. Fed. Home Loan Mortg. Corp., 494 F. Supp. 3d 80, 87 (D. Mass. 2020) (citation omitted).

In the context of mortgage and foreclosure-related disputes, it is "not enough" for purposes of Chapter 93A "to allege that defendants foreclosed on her property in violation of Massachusetts

foreclosure law." <u>Juárez v. Select Portfolio Servicing, Inc.</u>, 708 F.3d 269, 281 (1st Cir. 2013).

Indeed, in a case from within the mortgage loan modification context where a mortgage servicer

had sent allegedly inconsistent and confusing communications, the First Circuit explained that

although these communications rendered the loan modification process "all the more stressful,"

the allegations "at most sound in negligence, and 'a negligent act or acts, alone, do not violate

[Chapter 93A].'" <u>Young v. Wells Fargo Bank, N.A.</u>, 828 F.3d 26, 33 (1st Cir. 2016) (alteration in

original) (citation omitted).  And finally, as another Session of this Court has explained in the

mortgage loan modification context, "[a]llegations of ***mere technical violations or clerical errors***

. . . fail to give rise to a Chapter 93A claim." <u>Newell v. America's Servicing Co.</u>, No. 13-11141-

RGS, 2013 U.S. Dist. LEXIS 128479, at *8 (D. Mass. Sep. 9, 2013) (dismissing a Chapter 93A

claim *at the motion to dismiss* stage) (citation omitted and emphasis added).

### ii.  <u>Application</u>

The Court will first address Defendant's procedural arguments, namely that Plaintiff's

Complaint did not allege that he sent a 93A demand letter, which is required by statute, <u>see</u> Mass.

Gen. Laws ch. 93A, § 9(3), and that, relatedly, he did not produce the purported demand letter[21]

during discovery.  [ECF No. 34 at 14–15].  The Court has carefully reviewed the Complaint and

agrees that the sending of the notice letter was not alleged.  <u>See</u> [ECF No. 1-1].  Further, Plaintiff

has provided no sufficient explanation for why the letter was not produced during discovery.  As

the First Circuit has explained, 93A's statutory notice requirement "is not merely a procedural

nicety, but, rather, 'a prerequisite to suit.'  Furthermore, 'as a special element' of the cause of

action, it ***must be alleged*** in the plaintiff's complaint" <u>Rodi v. S. New Eng. Sch. of Law</u>, 389 F.3d

5, 19 (1st Cir. 2004) (emphasis added and citations omitted).  Accordingly, the Court finds that

---

[21] [<u>See</u> ECF No. 39-6].

summary judgment must enter in favor of Defendants on Count III on this procedural ground, alone.

However, even in the absence of this procedural defect, the Court would have granted summary judgment in favor of Defendants on Count III. Plaintiff argues that, "[s]imilar to the previous claims, the Defendants' failure to forgive the Deferred Principal Reduction Amount despite their issuing the 1099-C *constitutes an unfair and deceptive practice* under Massachusetts law." [ECF No. 38 at 17]. Plaintiff further alleges that by apparently not producing certain tax returns, Defendants have given rise to an inference of an unfair or deceptive practice since such evidence would seemingly suggest that they reaped certain tax benefits. [Id.] Neither of these arguments hold water when they are applied to the relevant 93A rules discussed *supra*.

First, *even if* Defendants had breached the Contract -- which this Court has already determined they did not -- this mere breach would not have triggered Chapter 93A liability. See Pepsi-Cola Metro. Bottling Co., 754 F.2d at 18 (citation omitted). Second and more fundamentally, no reasonable juror could find from this record that Defendants' actions were "egregiously wrong" and/or that their "objectionable conduct" attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'" See Hickman, 2024 U.S. Dist. LEXIS 89216 at *10 (citations omitted). To the extent that Plaintiff points to the sending of the Form 1099-C as evidence of an unfair or deceptive practice, that argument fails. As discussed at length above, the Defendants were legally obligated to send this tax document to Plaintiff. See 26 CFR 1.6050P-1. To the extent that Plaintiff argues that the June 4, 2019, transfer letter suggests an unfair or deceptive practice, that argument fails under the directly applicable legal precedent from this Circuit and from within this District. As noted *supra*, in Young, when a mortgage servicer sent allegedly inconsistent and confusing communications,

the First Circuit explained that although these communications rendered the loan modification process "all the more stressful," the allegations "at most sound in negligence, and 'a negligent act or acts, alone, do not violate [Chapter 93A].'"  828 F.3d 26, 34 (1st Cir. 2016) (alteration in original) (citation omitted).  However, the facts are even less favorable to the Plaintiff here than in Young, since Defendants sent a timely follow-up letter clarifying any possible confusion.  [ECF No. 35-24].  In any case, as another Session of this Court has already explained in this context, "[a]llegations of *mere technical violations or clerical errors*…fail to give rise to a Chapter 93A claim."  Newell v. America's Servicing Co., No. 13-11141-RGS, 2013 U.S. Dist. LEXIS 128479, at *3 (D. Mass. Sep. 9, 2013) (dismissing a Chapter 93A claim *at the motion to dismiss* stage) (citation omitted and emphasis added).

For all of these reasons, Plaintiff's Chapter 93A claim fails on a substantive basis, as well.  Accordingly, on both a procedural *and* a substantive basis, summary judgment is hereby **ENTERED** in favor of Defendants as to Count III.

### d.  Count IV (Declaratory Relief)

With Count IV, Plaintiff seeks a judicial declaration under Mass. Gen. Laws ch. 231 that "the [M]ortgage has been modified and that the amount of $406,714.94 shall be forgiven by the Defendants." [ECF No. 1-1 at 6].  Defendants argue that since Plaintiff's claims under Counts I-III fail, there is no legitimate controversy before the Court warranting a judicial declaration.  [ECF No. 34 at 17].

### i.  Legal Landscape

At the threshold, this Court will evaluate Plaintiff's request for declaratory relief -- which is a procedural matter -- under the Federal Declaratory Judgment Act, and not under Mass. Gen. Laws ch. 231.  See, e.g., Tocci Bldg. Corp. of N.J., Inc. v. Va. Sur. Co., 750 F.Supp.2d 316, 320

n. 2 (D. Mass. 2010) (explaining that "[a] declaratory judgment action is procedural only [,and] . . . '[i]t is settled law that, as a procedural remedy, the federal rules respecting declaratory judgment actions, apply in diversity cases'" (citations omitted)); <u>Hickman</u>, 2024 U.S. Dist. LEXIS 89216, at *18 n.5.

The Declaratory Judgment Act permits, but does not require courts to, "[i]n a case of actual controversy within its jurisdiction ... declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201. An "actual controversy" in this context "involves a substantial controversy of sufficient immediacy between parties holding adverse legal interests." <u>Hickman</u>, 2024 U.S. Dist. LEXIS 89216, at *18. In such cases, "federal courts retain substantial discretion in deciding whether to grant declaratory relief. <u>Ernst & Young v. Depositors Econ. Prot. Corp.</u>, 45 F.3d 530, 534 (1st Cir. 1995).

### ii.  <u>Application</u>

Here, the Court has entered summary judgment in favor of Defendants as to Counts I, II, and III. Since the effect of the Court's rulings run directly counter to Plaintiff's requested declaration that "the [M]ortgage has been modified and that the amount of $406,714.94 shall be forgiven by the Defendants," the Court finds that such a declaratory judgment is not appropriate Therefore, summary judgment is hereby **<u>ENTERED</u>** in favor Defendants as to Count IV.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' summary judgment motion [ECF No. 33] is **<u>GRANTED.</u>**

**SO ORDERED.**

Dated: March 31, 2025                          /s/ Margaret R. Guzman
                                               MARGARET R. GUZMAN
                                               United States District Judge